UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ALBERT G. BARELA, *by his next friend,*
*Cyndi Barela*,

      Plaintiff,

v.                                                                           Civ. No. 22-96 GJF/GBW

THE CITY OF HOBBS, et al.,

      Defendants.

**MEMORANDUM OPINION AND ORDER ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (COUNT II)**

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity as to Count II [ECF 76] ("Motion"). The Motion is fully briefed. *See id.*; ECFs 81, 84. The Court heard extensive argument on the motion on May 10, 2023. *See* ECF 94 ("Tr."). In sum, Defendants contend that Plaintiff lacks the legal and factual support necessary to rebut the presumption of qualified immunity regarding Defendants Marinovich and Still's arrest and handcuffing of Plaintiff. As explained below, the Court agrees. Thus, the Court will **GRANT** the Motion and **DISMISS** Count II **WITH PREJUDICE** because Defendants are immune from suit as to Plaintiff's excessive force claim.

**I. BACKGROUND**[1]

Around 8:30 p.m. on January 20, 2021, Hobbs Police Department Officers Marinovich and Still ("Defendants") encountered Plaintiff Albert Barela. (Mot. at 5 ¶ 1, 10 ¶ 24). Defendants saw

---

[1] The Court described the relevant facts at length in its first order granting summary judgment. *See* ECF 74 at 2–4 ("MSJ Order I"). But because the instant Motion is accompanied by additional evidence, the Court will issue a new set of factual findings. As such, for purposes of summary judgment, the Court will rely on facts that are either (1) admitted affirmatively (or by erroneous application of D.N.M.LR-Civ. 56.1(b)); (2) taken from video evidence "to the extent that it 'blatantly contradict[s]' [Plaintiff's] version of events," *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quotation omitted); or (3) inferred from construing the evidence "in the light most favorable to the nonmoving party." *Rowell v. Bd. of Cnty. Comm'rs*, 978 F.3d 1165, 1171 (10th Cir. 2020) (quotation admitted). Any other dispute of fact between the parties not mentioned in this summary is one the Court considers immaterial.

1

Plaintiff riding a bicycle on Grimes Street, at night, without front or rear safety lights. ECF 39-3 at 3; *see also* Media Ex. E at 00:00–00:20. Riding a bicycle at night without proper lighting is an arrestable offense. MSJ Order I at 17–18 (citing N.M. Stat. Ann. § 66-3-707 (1978)).[2]

Defendant Marinovich first attempted to stop Plaintiff by activating his patrol vehicle's emergency lights and twice placing his vehicle in Plaintiff's way. ECF 39-3 at 3; Media Ex. E at 00:31–00:32; Media Ex. K at 00:09–00:36. Both times, Plaintiff disregarded Marinovich and circumvented the vehicle. Media Ex. E at 00:30–00:35; Media Ex. M at 00:29–00:40. In response, Marinovich exited his vehicle and began chasing after Plaintiff's bicycle. Media Ex. M at 00:40–00:42. Mid-pursuit, Marinovich identified himself as a Hobbs Police Officer and commanded Plaintiff to stop. ECF 39-9 at 4. Plaintiff disregarded him yet again. *See* Media Ex. M at 00:40–00:43 (Plaintiff continuing to pedal away, possibly pedaling faster). Marinovich closed the distance and, once within arm's reach, tackled Plaintiff off his bicycle. Media Ex. M at 00:44–00:48.[3]

Within seconds of Plaintiff's precipitous encounter with the pavement, Defendant Still arrived and placed him in handcuffs. Media Ex. O at 00:10–00:46. Defendants ordered Plaintiff

---

[2] Plaintiff repeatedly asserts that Defendants' stated reasons for the attempted investigatory stop are pretextual. The Court has squarely rejected this argument. Resp. at 4–8; *but see* MSJ Order I at 20 n.13 ("[B]ecause there is no genuinely-disputed and material fact issue as to whether Plaintiff committed the traffic offenses or 'the resisting evading or obstructing' offense[,] any question about whether Marinovich recognized Plaintiff prior to seizing him is immaterial."). Moreover, the lawfulness of an arrest has no effect on a claim of excessive force under the Fourth Amendment.

[3] The parties dispute the manner in which Marinovich separated Plaintiff from his bicycle. For his part, Plaintiff alleges that Marinovich simply tackled him. Mot. at 16–17. But Defendants' version is that Marinovich instead attempted to pull Plaintiff to a stop but lost his balance and pushed Plaintiff away to avoid landing on him. Resp. at 14. Curiously, Defendants intimate that the Court already decided that Marinovich did not tackle Plaintiff, but a closer read of MSJ Order I shows otherwise. Plaintiff did not contest that fact as he does here, and the barely perceptible body camera footage does not "blatantly contradict [Plaintiff's] version of events." *See* Media Ex. M at 00:44; *accord Scott v. Harris*, 550 U.S. 372, 380 (2007). In lieu of conclusive video evidence, the Court must resolve this disputed fact in the light most favorable to Plaintiff, which means the Court assumes that Marinovich executed a tackle.

to stand, but he did not react—apparently due to his considerable cranial trauma. ECF 81-3 at 2 (diagnosing Plaintiff with five hematomas and three skull fractures). Indeed, the video depicts Plaintiff as noticeably disoriented and acting strangely. ECF 81-3 at 1; Media Ex. O at 00:49–01:59 (Plaintiff opening his eyes yet snoring). From that point on, Plaintiff did not use words to answer questions or express himself—he could only moan, whine, wail, and grunt. *See* Resp. at 13; Media Ex. O at 4:36–15:00; Media Ex. EE at 00:00–01:13, 02:00–02:37 (interviewing officer trying to question Plaintiff at the hospital about "why Officer Marinovich pushed [him] off the bike" and whether he was injured, but eventually giving up because Plaintiff's responses were unintelligible and he would not indicate where he was injured).

Still then repositioned Plaintiff from prone to seated and propped him up against his leg. Meanwhile, Marinovich immediately requested emergency medical services. Media Ex. V at 01:17–01:20; ECF 39-10 at 1. Both officers then became concerned about redirecting traffic given that Plaintiff was "in the middle of the street," so they took turns supporting Plaintiff and forming a perimeter with their patrol vehicles. Media Ex. M at 04:08–04:40; Media Ex. O at 03:19–03:23. Defendants then walked Plaintiff to a patrol vehicle where they directed him to lay down until the ambulance arrived. Media Ex. O at 05:53–06:01. At this point, Defendants double-locked Plaintiff's handcuffs.[4] Plaintiff began to wail. Media Ex. V at 7:03–7:11, 11:00–12:30.

Five minutes later, an ambulance arrived. ECF 39-10 at 4 (showing EMS dispatched at 8:41 PM and arriving at 8:45 PM); *but see* Resp. at 12 (citing ECF 39-10) (claiming the ambulance took eighteen minutes without pointing to any specific page of the call log). The officers then moved Plaintiff to an ambulance gurney, uncuffed him, repositioned his arms in front of his body, and re-cuffed him. Media Ex. O at 12:51–13:00. While doing so, they checked the cuff tightness.

---

[4] Double-locked handcuffs do not accidentally tighten when an arrestee adjusts his arms or hands. *E.g.*, *Gez v. Swoap*, 833 F.3d 646, 650 n.1 (6th Cir. 2016).

*Compare* Mot. at 12, *with* Resp. at 12.  Illumination from the ambulance's floodlights revealed a laceration encircling Plaintiff's right wrist.  *See id.*; Mot. at 12 ¶ 36 (disclaiming any knowledge of handcuff-related injury before this moment).

The ambulance transported Plaintiff to Lea Regional Hospital at 9:10 p.m.  ECF 39-11 at 1.  In an exam room, Still released Plaintiff's right wrist[5] and cuffed his uninjured left wrist to the bedrail.  Media Ex. X at 00:49–01:05.  But within sixty seconds of Still exiting the room, Plaintiff was out of bed and fiddling with his cuffed wrist.  *Id.* at 01:20–02:15  Still reentered the room to explain that the nursing staff wanted Plaintiff to remain in bed for his own safety and that getting out of bed might inadvertently make the cuff tighten, double-lock notwithstanding.  Media Ex. BB; Media Ex. CC (reentering to explain the same and promising to remove Plaintiff's handcuffs if he would "chill and lay down . . . and listen to hospital staff"); Media Ex. DD (removing the handcuff).  Still released both cuffs, as promised, but Plaintiff soon thereafter began standing again.  Media Ex. EE at 00:00–00:20.  He ignored Still's repeated commands to "sit down on the bed please."  *Id.* at 02:59–03:40.  Although Plaintiff somehow conveyed to his attending physician that "the handcuffs [we]re bothering [him]" to some extent, ECF 39-11 at 3, neither Plaintiff nor Lea Regional staff shared that information with Still.  Mot. at 13; Resp. at 14.  Plaintiff was eventually transferred to a medical facility in Lubbock, Texas.  *See generally* MSJ Order I at 4.  Forty-one days later, he was discharged from medical care.  *Id.*

---

[5] Defendant Still briefly re-cuffed Plaintiff's right wrist while a radiologist performed a CT scan, but the Court notes that Still appeared to avoid touching Plaintiff's wrist laceration, affixed the cuff above the laceration gingerly, and immediately double-locked the cuff.  Media Ex. Y at 0:4:48–04:58.  After Lea Regional staff returned Plaintiff to his room, Still uncuffed Plaintiff's right wrist again.  Media Ex. Z.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Ordinarily, a summary judgment motion requires "the movant [to] show[ ] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the summary judgment movant invokes qualified immunity, however, the analytical standard changes. The burden, ordinarily the movant's initial responsibility, shifts to the non-movant to first establish (1) that a constitutional right was violated and (2) that said right was "clearly established" at the time of the defendant's unlawful conduct. *E.g.*, *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden" of disproving the need for a jury's consideration by showing no dispute of material fact. *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).

For purposes of this inquiry, a court must provisionally resolve all genuine and material factual disputes in the nonmovant's favor. *E.g.*, *Tolan v. Cotton*, 572 U.S. 650 (2014). This typically means "adopting . . . the plaintiff's version of the facts." *Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020); *accord Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). But when the record "contains video evidence of the incident in question," the Court will "accept the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' the plaintiff's version of events." *Armstrong*, 973 F.3d 1127at 1131 (internal quotation omitted).

### B. Qualified Immunity

The doctrine of qualified immunity protects government officials, including police officers, "from undue interference with their duties and [the] potentially disabling threats of liability." *Id.* Consequently, § 1983 liability only threatens "the plainly incompetent or those who knowingly

5

violate the law," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation omitted), not those who "make reasonable but mistaken judgments." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (internal quotation omitted). "When a § 1983 defendant asserts qualified immunity, this affirmative defense 'creates a presumption that the defendant is immune from suit.'" *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (bracket and internal quotation omitted). The presumption shifts the burden to the plaintiff to show that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900–01 (10th Cir. 2016) (internal quotation omitted). If the plaintiff fails to make both showings, the court must grant the defendant qualified immunity. *Id.* at 901. Courts may address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To determine whether a constitutional right was violated, a court must first define the right in question and must not do so at a high level of abstraction. *E.g.*, *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 12 (2021). Here, the right at issue is the Fourth Amendment's protection against the use of excessive force as applied during the seizure and handcuffing of a fleeing misdemeanant bicyclist. For the violation of the right to be "clearly established," however, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *E.g.*, *Easter v. Cramer*, 785 F. App'x 602, 607 (10th Cir. 2019) (unpublished) (citation and quotations omitted); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022) (defining on-point precedent as "involv[ing] materially similar conduct"). If a factually similar case from the Supreme Court or the Tenth Circuit is not available, the plaintiff must cite to "a robust consensus of cases of persuasive authority in the Courts of Appeals." *E.g.*, *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)

(quotations omitted). Specificity of case law becomes "especially important in the Fourth Amendment context" because officers encounter an incredibly diverse array of circumstances from the mundane to the unprecedented. *Mullenix*, 577 U.S. at 12.

In recognition that "there will almost never be a previously published opinion involving exactly the same circumstances," *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007), the Supreme Court has endorsed an "obviously unconstitutional" exception wherein a § 1983 plaintiff's inability to produce on-point precedent is sometimes overlooked due to the egregiousness of the conduct being challenged. *E.g., Hope v. Pelzer*, 536 U.S. 730 (2002). The Tenth Circuit has also applied the "obviousness" exception in very rare cases, most recently in a case in which an off-duty and out-of-uniform sheriff's deputy seized and assaulted a law-abiding motorist by pointing a loaded firearm at him, misconduct that resulted in the deputy being fired, convicted of multiple felony crimes, and incarcerated. *See Rosales v. Bradshaw*, No. 22-2027, 2023 WL 4341269, at *1 (10th Cir. July 5, 2023). The Tenth Circuit emphasized:

> Although "[a] Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right," *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), "[t]here can also be 'the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances,' " *Truman v. Orem City*, 1 F.4th 1227, 1235–36 (10th Cir. 2021) (quoting *Wesby*, 138 S. Ct. at 590). "After all, some things are so obviously unlawful that they don't require detailed explanation[,] and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)); *see also id.* at 1211 ("[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." (quoting *Browder*, 787 F.3d at 1082–83)). Thus, qualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional. *See Taylor v. Riojas*, ––– U.S. –––, 141 S. Ct. 52, 53–54, 208 L.Ed.2d 164 (2020) (per curiam).

*Rosales*, 2023 WL at *8.

### C. Excessive Force

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use *some* degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). But the right to use force "in the course of an arrest, investigatory stop, or other seizure" is not unlimited. *Id.* at 395 (quotations omitted).[6] If the force used was disproportionate under the circumstances, the arrestee may later seek redress for a violation of "the Fourth Amendment [under] its reasonableness standard." *Id.* (internal quotations omitted). The fundamental question is "whether the [force used by the officers] was reasonable and proportionate given [the arrestee's] resistance." *Youbyoung Park v. Gaitan*, 680 F. App'x 724, 739 (10th Cir. 2017) (unpublished) (alteration in original) (citation omitted). Generally, answering this question triggers a three-factor test that considers: (1) "the severity of the crime at issue,"(2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.[7]

In assessing any excessive force claim, a court must always account for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

---

[6] As explained in MSJ Order I, the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. A person is "seized" within the meaning of the Fourth Amendment in one of two ways. *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) ("[T]he seizure of a person . . . can take the form of physical force [with an objective manifestation of intent to restrain] or a show of authority [with similar intent]" (internal quotation omitted)); *accord United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (requiring an objectively obvious showing of authority)." An officer is empowered to arrest for any criminal offense committed in the officer's presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

[7] The calculus changes when the conduct under review is the manner of handcuffing an arrestee, but the Court discusses that nuance later.

8

situation." *Id.* at 396–97 (requiring that courts adopt "the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

### III. PARTIES' PRIMARY ARGUMENTS[8]

Plaintiff endeavors to rebut Defendants' presumption of immunity with two arguments. First, he asserts that the facts proffered would enable a jury to find that both Defendant Marinovich's "deadly force"[9] tackle and Defendant Still's handcuffing each violated his Fourth Amendment right against excessive force. He characterizes Marinovich's tackle as excessively forceful relative to his own behavior, which he downplays not as "evading arrest" but simply "riding his bicycle home." The Court pauses to observe that such a charitable description omits any reference to the presence of a marked police vehicle with fully illuminated emergency lights and driven by a uniformed driver who twice positioned the vehicle in Plaintiff's path of travel. Resp. at 15–17; Tr. at 16:3–18. As for Defendant Still, Plaintiff claims that the chosen manner of handcuffing violated his right against excessive force because the cuffs were too tight, and Still allegedly knew that. Plaintiff infers this scienter from (1) Still being able to hear Plaintiff's "moan[s] in agony," (2) Still somehow relating those moans to the cuffs and not to the much more serious head injury, and (3) Still nonetheless choosing not to loosen or remove the cuffs. Resp. at

---

[8] Both parties submit their version of the facts and disagree over whether those facts are material and disputed. *Compare* Mot. at 5–13, *and* Reply at 1–15, *with* Resp. at 4–15 (claiming Plaintiff's facts are disputed and providing additional facts). But the Court need not wade into the merits of those disputes because, as explained below, Plaintiff has failed to show that the law was clearly established on the facts of this case.

[9] Plaintiff maintains that Defendant Marinovich's tackle was an application of "deadly force." *E.g.*, Resp. at 15–16 (citing four cases involving fatal *shootings* by law enforcement); Tr. at 23:41 (citing N.M.R.A. UJI § 14-5186). But that characterization is profoundly exaggerated. First, Plaintiff himself conceded that this jury instruction has no bearing on this case. Tr. at 14:11 (noting N.M.R.A. UJI § 14-5186 applies when a defendant meets an officer's use of excessive force with self defense). Second, the jury instruction does not define deadly force—it only defines "excessive force." N.M.R.A. Crim. UJI § 14-5186 ("Excessive force means greater force than reasonably necessary."). Of the other eleven New Mexico jury instructions that mention "deadly force," none of them define the term. *See* N.M.R.A. Crim. UJI §§ 14-2214, 5170–73, 5180–84, 5186, 5191.

22–24.[10]  Second, Plaintiff contends that these violations were clearly established by several cases cited below and, even if those cases proved inapposite, Defendants' conduct was egregious enough to be an "obvious" violation such that the lack of on-point precedent should be excused. *Id.* at 18–21; Tr. at 19:14–16.

Defendants respond by arguing that the officers' actions were reasonable—ergo, not constitutional violations—in light of the circumstances.  For example, Defendants assert that Plaintiff's demonstrated disregard of their displays of authority justified Marinovich using some force to subdue "a fleeing misdemeanant on a bicycle." Mot. at 18–24.  Similarly, they point to Plaintiff's evasive maneuvers, the presence of other automobile traffic, and poor lighting conditions as valid reasons for Still's decision to handcuff Plaintiff until paramedics arrived. *Id.* at 24–27.  And Defendants argue that even if Still fastened the cuffs too tightly, he did not know this until later, at which point he began mitigating Plaintiff's discomfort when cuffing was necessary and later released the injured wrist at the hospital. *Id.*  Finally, Defendants insist that even if their actions violated a constitutional right, Plaintiff cannot point to any sufficiently analogous decisions issued before the incident that would have put Defendants on notice that their respective conduct violated that right. *Id.* at 22–23, 26; Reply at 18, 19–20.

## IV. ANALYSIS

To overcome the presumption of qualified immunity, Plaintiff must use the *Graham* factors to show (1) that the force deployed was disproportionate to the circumstances and (2) identify a published Supreme Court or Tenth Circuit decision that would have put Defendants on notice that their specific use of force was unlawful.  For the following reasons, the Court concludes that

---

[10] Plaintiff also argued that Still violated the Fourth Amendment by handcuffing him at all in his "non-resisting, barely conscious" condition. Resp. at 23. But Plaintiff conceded at oral argument that he could not find any on-point precedent to support his position. Tr. at 21:24–22:3. The Court considers that concession to foreclose Plaintiff's ability to overcome qualified immunity with respect to the initial act of handcuffing him.

Plaintiff has failed to rebut qualified immunity with respect to both Defendants.  For Marinovich, the Court holds that tackling a fleeing, unarmed misdemeanant bicyclist was neither a clearly established nor an egregiously obvious violation of the Fourth Amendment when it happened to Plaintiff.  As for Still, the Court holds as a matter of law that Plaintiff did not suffer a sufficient injury to support finding a constitutional violation occurred, so the Court has no need to consider whether the violation was of a clearly established right.  Thus, the Court must dismiss Count II because both Defendants are immune from suit.

### A.  Defendant Marinovich's Tackle

A right is clearly established when every officer should be "sufficiently clear that . . . what he is doing violates th[e] right."  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (citing *Mullenix v. Luna*, 557 U.S. 7, 11 (2015) (per curiam)).  A right does not require a case directly on point to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 580 U.S. 548, 551 (2017).  Moreover, courts excuse a plaintiff's inability to produce on-point precedent in "the rare 'obvious case[ ]' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004) (*per curiam*)).  But this exception is rarely appropriate—"'a body of relevant case law' is usually necessary."  *Wesby*, 138 S. Ct. at 590.

Plaintiff argues that *Perea v. Baca* put Marinovich on notice that tackling a fleeing misdemeanant off his bicycle would be unlawful.  Tr. at 16:22–17:1; *accord Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016).[11]  The Court disagrees.  While *Perea* features some minor similarities

---

[11] The Response also cites three inapposite Tenth Circuit cases and two ineligible cases—one from the District of Colorado and another from the Sixth Circuit.  Resp. at 19 (first citing *Hays v. Ellis*, 331 F. Supp. 2d 1303, 1309 (D. Colo. 2004) (removing a traffic misdemeanant from his vehicle), then citing *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (fatally shooting an armed domestic violence suspect), then citing *Seiver v. City of Lawrence*, 60 F.3d

to this case, it is manifestly distinguishable. First, the similarities: Perea was not accused of a serious crime—officers began looking for him because his mother requested a welfare check. Like Plaintiff, Perea was on a bicycle, actively evading attempts to detain him with a lit-up patrol car after he had committed a minor traffic violation. And, as here, officers abandoned their vehicles in favor of a foot pursuit that ended when they "push[ed] Perea off his bicycle." *Id.* at 1201. But the similarities end there. Unlike what happened to Plaintiff, the force used on Perea was not just a tackle. Once unseated from his bicycle, Perea began thrashing and struggling, which led officers to taser him "for a total of ten t[imes] in less than two minutes." *Id.*; Tr. at 17:19 (Plaintiff conceding that *Perea* involves different facts). Although the Tenth Circuit observed in passing that Perea was tackled off a bicycle, the *holding* was that "[t]he repeated use of the taser against a subdued offender is clearly unreasonable and constitutes excessive force" and, further, that "continuing to taser Perea, a subdued misdemeanant, violated clearly established law." *Compare* Tr. at 17:13–22 (reacting to a verbatim reading of *Perea*'s technical holding with *obiter dicta*), *with Perea*, 817 F.3d at 1204–05. The Court further notes that the issue of the tackling was not appealed. *E.g.*, Tr. at 19:1–6.

Even a cursory review of *Perea* reveals that the Tenth Circuit focused on the officers gratuitously tasing a fleeing misdemeanant bicyclist, and never considered whether the tackling was itself a violation. Thus, because *Perea* explicitly cabined its holding to "the officers' repeated tasering of [the plaintiff] after he was subdued," the case would not have put Marinovich on notice

---

695, 699 (10th Cir. 1995) (fatally shooting an armed and suicidal subject of a welfare check), then citing *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991), and then citing *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (fatally shooting an armed deadly assault suspect)). Because none of these cases present facts even remotely similar to this case, the Court does not discuss them further.

that his tackling of a fleeing misdemeanant bicyclist would violate a clearly established Fourth Amendment right. *Perea*, 817 F.3d at 1198, 1205.

Plaintiff alternatively argues, however, that Marinovich's conduct was such an "obviously egregious" violation that he should "still be on notice." Resp. at 18–19 (first quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004), then quoting *Pelzer*, 536 U.S. at 741)); *see also* Tr. at 19:14–16. But because Plaintiff offers no further explanation, the conclusion itself is the entirety of his argument. Consequently, the Court rejects the argument as *ipse dixit* and inadequately briefed.[12] Insufficient briefing notwithstanding, Plaintiff's legal theory would have fallen short on these facts anyway. Marinovich's actions, which the Court considers unnecessary and emblematic of poor decision-making, pale in comparison to the egregious violations at issue in *Pelzer* and its progeny.[13] The same goes for this week's Tenth Circuit decision in *Rosales*, which featured stunning allegations of a deputy going rogue, going berserk, and then going to prison. Finally, the Court notes that the rarity with which the "obviously unconstitutional" doctrine is applied strongly suggests that extraordinarily bad and deviant behavior is the bare minimum to animate the exception. Whatever else can be said about Marinovich's behavior on the night he

---

[12] D.N.M.LR-Civ 7.1(a) (a motion must "state with particularity the grounds and the relief sought"); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (courts may limit their consideration to the issues "that have been adequately briefed for [the court's] review"); *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (internal quotation marks omitted)).

[13] Pelzer was an inmate handcuffed to a hitching post ***for seven consecutive hours without bathroom breaks and only two opportunities to drink water***. Guards made Pelzer remove his shirt in direct sunlight to encourage a sunburn, and they ***taunted him about his thirst*** by offering water to dogs near him and pouring water out in front of him. *Pelzer*, 536 U.S. at 734–35. By contrast, Plaintiff had ignored three displays of authority—two near-collisions with an illuminated patrol car and a shouting officer—which practically necessitated some degree of force to effect arrest. Media Ex. M at 00:29–00:48; *accord Mendenhall*, 446 U.S. at 554; *Torres*, 141 S. Ct. at 995; *Graham*, 490 U.S. at 396. When asked what other options Defendant Marinovich had, Plaintiff suggested "a little bit of good manners" and saying "excuse me please, could you stop so I can talk to you" to a rapidly pedaling misdemeanant. Tr. at 10:10–11. It is enough to say that the Constitution allows an officer to dispense with common courtesy once it becomes necessary to use a reasonable and proportionate amount of force to make an arrest.

13

chased after Plaintiff – and no matter how regrettable and worthy of criticism it appears in hindsight – his behavior in the Court's view does not come close to "*obviously* unconstitutional."

Because Plaintiff has not shown that then-existing case law clearly established that Marinovich's conduct would have violated Plaintiff's Fourth Amendment rights, or that the conduct was "obviously unconstitutional," there is no need for the Court to "depart[ ] from the general rule of constitutional avoidance" and also decide whether that conduct violated the Fourth Amendment. *Pearson*, 555 U.S. at 241.[14]

### B. Defendant Still's Handcuffing

To recap, Plaintiff makes two handcuffing arguments: (1) handcuffing him at all violated his right against excessive force, and (2) the manner of handcuffing constituted a separate and independent violation of that same right. Resp. at 18–24. But of these two arguments, only one merits discussion.[15] Plaintiff insists that he was handcuffed with excessive force because Still somehow interpreted Plaintiff's unintelligible and indeterminate moaning as an indication that his handcuffs were fastened too tightly. According to Plaintiff, Still chose not to remove the cuffs despite allegedly knowing that it would prolong Plaintiff's suffering. Plaintiff argues that because he began to "moan in agony" when his handcuffs were first double-locked and again when Defendants readjusted them on the ambulance gurney, "it was obvious" to Still that the handcuffs were causing pain. Resp. at 23–24; *accord* Media Ex. V at 7:03–7:11, 11:00–12:30.

---

[14] The Court's criticisms of Marinovich's use-of-force decision-making speak for themselves and should not be considered a substitute for the rigorous application of the *Graham* factors the Court would have undertaken had the "clearly established" analysis ended differently.

[15] The Response mostly focuses on whether Still's decision to cuff Plaintiff was warranted. *See, e.g.*, Resp. at 22–24 (contesting the need for handcuffs at all because of Plaintiff's disoriented state and because officers allegedly "knew where [he] lived" would nullify any further risk of flight). Although Plaintiff insists that he presented no reason for Defendants to handcuff him, the Court has already held that Defendants had probable cause to arrest him. MSJ Order I at 17–20. And because nearly any arrest justifies the use of handcuffs, Plaintiff's objection to Still's decision to handcuff him is without merit. *Gardner*, 974 F.3d at 1166.

"[I]n nearly every situation where an arrest is authorized . . . handcuffing is appropriate." *E.g.*, *Mglej v. Gardner*, 974 F.3d 1151, 1166 (10th Cir. 2020) (internal quotation omitted). Although handcuffing is almost always permitted, a plaintiff can still bring an excessive force claim to challenge an officer's manner of handcuffing. *E.g.*, *Fisher v. City of Las Cruces*, 584 F.3d 888, 894, 901 (10th Cir. 2009). Such a claim requires the plaintiff to show (1) that "the force used was more than reasonably necessary" and (2) "some non-de minimis actual injury." *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020). Actual injury requires more than minor, temporary injuries including "superficial abrasions." *E.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1247–48 (10th Cir. 2011); *see also Strassell v. Norris*, No. 17-cv-02297, 2020 WL 1812245, at *4 (D.N.M. April 9, 2020) (unreported) (collecting cases). Because the *Graham* factors offer little guidance in determining whether disproportionate force was used, *Fisher*, 584 F.3d at 895–96, 902 n.1, a plaintiff must instead show that the officer acted with scienter. *E.g.*, *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (requiring a showing "that an officer ignored [a plaintiff's] timely complaints (or was otherwise made aware) that the handcuffs were too tight"). In assessing the officer's culpability, the court must consider whether (1) the officer knew that the manner of handling a cooperating arrestee seriously risked exacerbating the arrestee's injuries and (2) the officer knew—or, at least, should have known—about those injuries. *See Fisher*, 584 F.3d at 901.

The Court's analysis begins with Plaintiff's injury: a "small" wrist laceration. ECF 81-5.[16] He proffers evidence that the handcuffs dug into his wrist enough to break the skin and draw blood. *E.g.*, *id.* But the medical evidence characterized the laceration as a shallow cut at best. *See id.* Beyond that, Plaintiff suffered no other handcuff-related injury. His left wrist was unscathed, and there is no evidence in the record of either wrist experiencing any lasting effects like nerve damage.

---

[16] To be clear, Plaintiff's counsel later conceded that Plaintiff's only wrist injury is to his *right* wrist and that any mention of his left wrist in the Response is a typo. Tr. at 25:16–17.

ECF 76-2 at 3.  On these facts, Plaintiff has not shown more than a "superficial abrasion[ ]," which as a matter of law is insufficient to support his excessive force claim.  *Koch*, 660 F.3d at 1248.

Even if a shallow cut were properly considered an "actual injury," however, Plaintiff must show that Still acted with the requisite malintent.  To do so, he would have to proffer evidence of when Still first became aware of the injury and that Still's subsequent actions were maliciously indifferent towards the pain the handcuffs were causing Plaintiff.  But both parties agree that Defendants first noticed Plaintiff's laceration when they repositioned his cuffs under the ambulance's floodlights.  *Compare* Mot. at 12, *with* Resp. at 12 (admitting the fact by failing to specifically controvert it); *accord* Media Ex. O at 11:26–12:54.  Plaintiff simultaneously argues that his general and indiscriminate moaning should have put Defendants on notice that the moaning was specifically occasioned by discomfort from the handcuffs. Resp. at 23–24.  But Plaintiff was vastly more injured from the larger and more serious injury to his head after Marinovich separated him from his bicycle.  Tr. at 23:16.  Moreover, the cause of Plaintiff's groaning cannot be consistently traced to manipulation of his handcuffs; the video shows that other events coincidentally triggered Plaintiff's moaning, including: (1) being escorted from the middle of the street, (2) having his breast pocket emptied, (3) standing in front of a patrol car's back seat, (4) being asked to sit in that back seat, and (5) the arrival of paramedics.  Media Ex. V at 5:20–5:27, 5:55–6:00, 6:28–6:55, 7:22–8:10, 8:11–10:00.

Even with the benefit of all reasonable inferences construed in Plaintiff's favor, and even supposing that Still knew the handcuffs were too tight before the ambulance arrived, the uncontroverted video evidence belies the contention that Still deliberately aggravated Plaintiff's injury with the handcuffs.  Indeed, the video evidence shows Still beginning to re-lock Plaintiff's cuffs around his wrist laceration ***but then stopping and repositioning them*** to avoid the injured

area. *See* Media Ex. O at 12:50–12:54. Once at the hospital, Still released the injured wrist altogether. Media Ex. X at 00:43–01:46. These actions are inconsistent with the scienter required—if anything, they appear instead to be attempts to avoid causing Plaintiff pain. Such behavior cannot be considered excessive force.

In sum, Plaintiff's alleged handcuffing injury is not an "actual injury" under binding excessive force precedent. On these facts, mindful of "the perspective of a reasonable officer on the scene," the Court concludes that Plaintiff has not proffered sufficient evidence to show that he was injured by "unduly tight handcuffing." *Compare* Resp. at 22 (first citing *Vondrak v. City of Las Cruces*, 535 F.3d 1198 (10th Cir. 2008), then citing *Muehler v. Mena*, 544 U.S. 93 (2005)), *with Vondrak*, 535 F.3d at 1209 (predicating an excessive force claim on permanent wrist nerve damage), *and* ECF 81-5 (suffering a shallow wrist laceration at best).

## V.   CONCLUSION

For the foregoing reasons, the Court holds that the officers are entitled to summary judgment based on qualified immunity with respect to Count II.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary [ECF 76] is **GRANTED**. Count II of Plaintiff's Complaint [ECF 1] is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the remaining state law claims in Plaintiff's Complaint—Counts III and V, [ECF 1 at 7–9] are **DISMISSED WITHOUT PREJUDICE** because the Court **DECLINES** to exercise supplemental jurisdiction over them.

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*