**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

CELESTE BARELA, Personal Representative
of the ESTATE OF ALBERT BARELA,

      Plaintiff,

v.                                            Civ. No. 22-96 GJF/GBW

THE CITY OF HOBBS, *et al*.,

      Defendants.

**MEMORANDUM OPINION AND ORDER ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (COUNT III)**

THIS MATTER is before the Court on Defendants City of Hobbs and John Joseph Ortolano's Motion for Summary Judgment on Monell and Supervisory Liability Claims in Count III of Complaint [ECF 133] ("Motion"). The Motion is fully briefed. *See id.*; ECFs 138, 144. Defendants contend that they are entitled to summary judgment on the sole remaining count in Plaintiff's Complaint, which asserts claims under 42 U.S.C. § 1983 for municipal liability against the City of Hobbs ("the City") and supervisory liability against former Chief of Police John Joseph Ortolano ("Chief Ortolano"). As explained below, the Court agrees. Thus, the Court will **GRANT** the Motion and **DISMISS** Count III and this case **WITH PREJUDICE**.

## I.   INTRODUCTION

This case arises out of a January 20, 2021 encounter between officers of the Hobbs Police Department ("HPD") and Albert Barela ("Albert"). Albert, by his next friend Cyndi Barela, asserted six counts in his Complaint: (a) that Officers Brandon Marinovich and Robert Still violated his Fourth Amendment rights by unlawfully arresting him (Count I) and using excessive force against him (Count II); (b) that the City and Chief Ortolano failed to properly train and supervise officers (Count III); (c) that all Defendants violated his Fourth Amendment rights by

1

maliciously prosecuting him without probable cause (Count IV); (d) that all Defendants violated state tort law (Count V); and (e) that unspecified Defendants violated his rights under the New Mexico Civil Rights Act because he "was maliciously prosecuted for criminal conduct without any probable cause in contravention of the New Mexico constitution" (Count VI). *See* ECFs 1 at 5–9; 74 at 5.

The Court issued two prior Memorandum Opinions and Orders in response to Defendants' summary judgment motions, each aimed at different counts in the Complaint. In the first, the Court determined that Officers Marinovich and Still were entitled to summary judgment based on qualified immunity with respect to Counts I and IV and that Defendants were entitled to judgment on the pleadings and/or summary judgment on Count VI. *See* ECF 74 at 24. In the second, the Court held that Officers Marinovich and Still were also entitled to summary judgment based on qualified immunity with respect to Count II. *See* ECF 95 at 17. This left Counts III and V.

As part of its second Memorandum Opinion and Order, the Court inadvertently mischaracterized Count III as a state law claim and dismissed it without prejudice, along with Count V, after declining to exercise supplemental jurisdiction. *See* ECF 95 at 17. Recognizing its own mistake, the Court apprised the parties, who filed a Joint Motion to Alter or Amend Judgment. ECF 107. The Court granted the joint motion and reinstated Counts III and V of the Complaint. ECF 111. Thereafter, Albert voluntarily dismissed Count V, explaining that he filed a New Mexico Tort Claims Act complaint in state court because he preferred to pursue the state law claims originally brought in Count V in that forum. ECF 113.

All of Albert's other claims having been resolved by summary judgment or voluntarily dismissal, Defendants moved for summary judgment on Count III. ECF 133.  In that count, Albert asserts claims for supervisory and municipal liability under 42 U.S.C. § 1983 against the City and

Chief Ortolano. ECF 1 at 7. Specifically, he alleges that inadequate training and supervision by Chief Ortolano of HPD officers as to use of force constituted deliberate indifference to and acquiescence in Albert's constitutional injury. *Id*. ¶ 42. Relatedly, he asserts that the deliberate indifference of Chief Ortolano and other supervisors amounted to a custom, practice or policy of the City that was the moving force behind the use of excessive force by Officers Marinovich and Still against Albert. *Id*. ¶ 43. And he contends that "[t]he actions of Chief Ortolano and other supervisors, and the custom, practice, or policy pursuant to which the actions were taken, were objectively unreasonable and intentional, willful, wanton, and in reckless disregard of [Albert's] constitutional rights" and "proximately caused [his] constitutional injuries." *Id*. ¶¶ 44, 45.

While the Court's resolution of prior summary judgment motions did not explicitly address Count III, the second of the Court's orders addressed the excessive force claims that underpin Albert's supervisory and municipal liability claims. In so doing, the Court effectively narrowed the scope of Albert's supervisory and municipality liability claims. That is, Albert's excessive force claim against Officer Still may not serve as a predicate for the supervisory or municipal liability claims because the Court determined that the manner in which Officer Still handcuffed Albert did not violate his constitutional rights. *See Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020) ("[A] city may not be held liable for failure to train 'when there has been no underlying constitutional violation by one of its employees.'"). In contrast, the Court did not reach the question of whether Officer Marinovich's removal of Albert from his bicycle was a constitutional violation but instead grounded its qualified immunity determination for that claim on the clearly established prong of the analysis. ECF 95 at 11–14 (concluding that tackling a fleeing, unarmed misdemeanant bicyclist was not a clearly established violation of the Fourth Amendment). By implication, therefore, the Court left Count III intact at least insofar as Albert's

supervisory and municipal liability claims are premised on the alleged unconstitutional use of force by Officer Marinovich. ECF 133 at 4 (Defendants conceding that although the Court granted summary judgment to Officer Marinovich on the basis of qualified immunity, "Plaintiff's excessive force claim against Officer Marinovich can still form the predicate to the Monell and supervisory liability claims in Count III").

Tragically, before the Court could address the merits of Count III, Albert died from injuries sustained in a June 29, 2024 motor vehicle accident, which was unrelated to the claims in this case. ECF 148. In light of Albert's passing, the Court directed the parties to brief the issue of whether his claims in Count III survived. ECF 149. The parties responded in unison: Albert's death did not extinguish the municipal and supervisory claims in Count III. *See* ECFs 150; 151. With the benefit of the parties' briefing, the Court agrees that Albert's death implicates New Mexico's abatement statute, N.M. Stat. Ann. § 37-2-4 (1978), which provides that a pending action does not abate upon the death of a plaintiff. *See* ECF 150 at 2; ECF 151 at 1–2. Thus, the case proceeds with Celeste Barela, the personal representative of Albert's estate, substituted as Plaintiff in this action. ECF 153.

To summarize, Plaintiff's supervisory and municipal liability claims, though now narrowed, have survived a mistaken dismissal, a qualified immunity determination as to the

predicate excessive force claims, and Albert's untimely and unfortunate death. Count III now takes

center stage for the final episode of the summary judgment trilogy.

## II.  FACTUAL BACKGROUND[1]

### A.  The Incident

Around 8:30 p.m. on January 20, 2021, HPD Officer Brandon Marinovich observed a

subject riding his bicycle in violation of traffic statutes.[2] ECF 133 at 7 ¶ 2; ECF 1 ¶ 7. Activating

his patrol vehicle's emergency lights, Officer Marinovich twice attempted to stop Albert by

placing his vehicle in Albert's path, but Albert disregarded and evaded these attempts. ECF 133 at

7 ¶ 2; *see also* ECF 39, Media Ex. E at 00:30–00:35, Media Ex. K at 00:09–00:36, Media Ex. M

at 00:29–00:40. In response, Officer Marinovich exited his vehicle and began chasing after

Albert's bicycle, but Albert continued to pedal away from Officer Marinovich. *See* ECF 39, Media

Ex. M at 00:40–00:43. Officer Marinovich eventually closed the distance and, once within arm's

---

[1] The Court has twice described the relevant facts at length in previous orders granting summary judgment. *See* ECF 74 at 2–4; ECF 95 at 1–4. Because the instant Motion asserts new facts and is accompanied by additional evidence, the Court once again will set out the material facts. In so doing, the Court will rely on facts that are either (1) affirmatively admitted by the opposing party; (2) not "specifically controverted" by the opposing party pursuant to D.N.M.LR-Civ. 56.1(b); and/or (3) taken from video evidence, with the Court "accept[ing] the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' [Plaintiff's] version of events," *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quotation omitted). The Court addresses many of Plaintiff's attempts to dispute Defendants' proffered statements of fact in footnotes that follow. Any other dispute of fact between the parties not mentioned herein is one the Court considers immaterial to the resolution of Defendants' motion. For instance, insofar as Plaintiff's Statements of Additional Material Facts ("SAMF") relate to bias-based or selective policing in minority communities and/or alleged discriminatory behavior toward racial minorities, the Court has disregarded those proffered facts as immaterial. *See* ECF 138 ¶¶ A–F, H. Likewise, statements in Plaintiff's SAMFs that relate to alleged deficiencies in training or supervision on topics other than use of force or interacting with individuals with mental illness have also been treated as immaterial. *See id.* ¶ I–J, M, P–Z.

The Court acknowledges Plaintiff's attempts to incorporate into her SAMFs by reference "Additional Material Issues of Fact in Dispute in Document 48 1-13." S*ee id.* ¶ AA. However, the response brief to which Plaintiff refers does not clearly set out additional factual statements numbered 1–13 as paragraph AA suggests; nor does it include "lettered" additional facts as D.N.M.LR-Civ. 56.1(b) requires. *See* ECF 48. The Court will not sift the "Relevant Facts to Be Accepted as True for Purposes of the Motion" in a response to a *different* summary judgment motion for facts that might be relevant to Count III.

[2] Riding a bicycle at night without proper lighting is an arrestable offense. ECF 74 at 17–18 (citing N.M. Stat. Ann. § 66-3-707 (1978)).

reach, tackled Albert off his bicycle. ECF 133 at 8 ¶ 4; *see also* ECF 39, Media Ex. M at 00:44–00:48. Within seconds of Albert being knocked to the pavement, Officer Still arrived and placed him in handcuffs. *See* ECF 39, Media Ex. O at 00:10–00:46. Albert's impact with the pavement caused cranial trauma that necessitated his air-evacuation to a larger medical center and over forty days of inpatient medical care. ECF 133 at 8 ¶ 4; ECF 138, Ex. 5; ECF 74 at 4.

Officer Marinovich's encounter with Albert that night was not his first. He had previously spoken to Albert over the phone, had been dispatched to his home, could recognize him by sight, and had seen him riding a bicycle through Hobbs on other nights. ECF 133 at 7 ¶ 3. Officer Marinovich clarified, however, that on the other nights he observed Albert riding his bicycle, Albert was in compliance with traffic ordinances (*i.e.*, using a headlight and riding with the flow of traffic). ECF 133 at 7 ¶ 3; *see also* ECF 133, Ex. B at 29:8–30:4. Video taken from Officer Marinovich's dash camera at the time of the subject incident depicts Albert's face as he rode by on his bicycle, looking in the direction of Officer Marinovich's vehicle and raising his middle finger. ECF 133 at 7 ¶ 3; *see also* ECF 39, Media Exs. E, K, M. Nevertheless, Officer Marinovich testified that he did not recognize Albert until Albert was off his bicycle and in handcuffs. ECF 133 at 7 ¶ 3; ECF 138 at 4, ¶ 3(i); *see also* ECF 133, Ex. B at 45:22–47:17 (testifying that even though Albert's face can be seen in the dash cam video, he did not see Albert's face from his position in the driver's seat of his patrol unit). Even if Officer Marinovich *did* recognize Albert before he engaged in a foot pursuit, as Plaintiff suggests he should have, Officer Marinovich was not aware that Albert had schizophrenia or any other mental health diagnoses, or that he previously had been deemed incompetent.[3] ECF 133 at 7 ¶ 3.

---

[3] Plaintiff asserts that Albert's "cognitive issues were well known to Mr. Marinovich and the entire Hobbs Police Department as a result of multiple run-ins and criminal charges that were dismissed because of [Albert's] incompetence." ECF 138 at 11, ¶ 26(iii)). In support, Plaintiff cites Officer Marinovich's deposition testimony that he was aware that Albert called HPD dispatch between 2017 and 2021 and said awful and threatening things, that he had

**B.  Monitoring and Supervision of Officer Conduct**

HPD enters citizen complaints and use of force incident reports into its Internal Affairs Pro database ("IA Pro") and then tracks that data with its Early Intervention System ("EIS"), an information access tool. *Id*. at 8 ¶¶ 5–6. The EIS helps HPD supervisors recognize performance problems among law enforcement officers by issuing notifications when an officer accumulates five "points" in any quarter for various categories of incidents, such as vehicle pursuits, vehicle accidents, use of force, show of force, discharge of firearm, citizen complaints, or tort claim notices. *Id*. at 8–9 ¶¶ 5, 8. HPD can use EIS reports to identify tendencies in the frequency of events that might otherwise be overlooked when examining each event independently. *Id*. at 9, ¶ 9. HPD's Accreditations Manager maintains EIS records and prepares quarterly reports for officers who trigger notifications. *Id*. at 9 ¶ 10. Once the reports are generated, HPD supervisors review the incidents that prompted the EIS notifications. *Id*.

From the time he was hired in 2013 until his January 20, 2021 encounter with Albert, Officer Marinovich triggered the EIS quarterly reporting notification in one or more quarters in 2015, 2016, 2017, and 2018. *Id*. at 6 ¶ 1, 9 ¶ 11. In 2015 and 2016, he triggered the EIS notification

---

spoken to Albert over the phone, and that he been to his residence on one occasion. ECF 138 at 11 ¶ 26(iii) (citing ECF 47, Ex. 2, at 24:14–26:12). Even viewing this evidence in the light most favorable to Plaintiff, the Court cannot say that it controverts Defendants' statement of fact, supported by Officer Marinovich's deposition testimony, that Officer Marinovich was unaware Albert had schizophrenia or any other mental health diagnoses or had been deemed incompetent prior to the January 20, 2021 encounter.

Plaintiff makes a further attempt to dispute Defendants' factual assertion by relying upon the Declaration of Beth Mohr, her police procedures expert. *See* ECF 138 at 5, ¶ 3(iii) (citing ECF 138, Ex. 1 ¶ 27). In the referenced portion of that declaration, Ms. Mohr avows: "The fact that Officer Marinovich repeatedly used his vehicle to cut off [Albert] on his bicycle, and that this was done for no reason from [Albert's] perspective, would only have served to reinforce [Albert's] delusional beliefs." ECF 138, Ex. 1 ¶ 27. She further opines that "a properly trained officer would have realized this, and would have used a different, and more appropriate, approach to making the stop." *Id*. As discussed more fully below, when considered in conjunction with Ms. Mohr's deposition testimony, the Court concludes that Ms. Mohr's opinions are speculative and lack proper foundation. *See infra* pp. 18–19. As such, the opinions on which Plaintiff relies do not genuinely dispute Defendants' statements of facts.

in only one quarter, but in 2017 and 2018, he triggered it in three separate quarters.[4] *Id*. at 9 ¶ 12. Officer Marinovich's supervisors reviewed the reports generated from the EIS notifications on each occasion and determined that each of the notification-triggering use of force incidents were within HPD policy. *Id*. at 9 ¶ 13. As a result, HPD did not discipline Officer Marinovich for these incidents.[5] *Id*. During the same time period, Officer Marinovich was named or identified as the subject of five tort claim notices by citizens of Hobbs, none of which involved allegations of excessive force or battery during arrest. *Id*. at 9 ¶¶ 14, 15. Officer Marinovich was also the subject of six citizen complaints involving allegations of excessive force, though HPD's reviews did not sustain any those allegations. *Id*. at 10 ¶¶ 16, 17.

Department wide, HPD's IA Pro database included seven use of force incident reports or tort claim investigative reports by HPD officers involving persons suffering from mental health issues in the five years preceding January 20, 2021. *Id*. at 10, ¶ 18. Each incident or notice was

---

[4] Plaintiff attempts to dispute Defendants' accounting of Officer Marinovich's EIS notifications by suggesting that "[b]etween 2012 and 2016, there was no record management system capable of capturing traffic and pedestrian stop and search data nor reliable data elements for an early intervention system." ECF 138 (citing ECF 138, Ex. 4 ¶¶ 84–88). In support, she refers the Court to portions of Robert L. Stewart's expert report, which he prepared in the context of an employment discrimination and retaliation case brought by several former HPD officers alleging they were subject to adverse employment actions after speaking out against selective policing practices that targeted minority communities. *See* ECF 138 at 7 ¶¶ 11–13 (citing ECF 138, Ex. 4)); *see also Ellis v. Hobbs Police Department*, 17cv1011 WJ/GBW (Doc. 1) (D.N.M. Oct. 5, 2017). Mr. Stewart's expert report refers to three different record management systems ("RMS") used by HPD from 2012 and 2017, but there is no indication that the records tracked through these various RMSs (*i.e.*, New Word, Capers, Spillman) are the same as those tracked in HPD's IA Pro database. *See* ECF 138, Ex. 4, ¶ 84. Indeed, Defendants submit the supplemental declaration of HPD's Accreditation Manager, Kristi Kelley, in which she explains that "[t]he EIS quarterly reviews on use of force are generated from data that is input into the IA Pro database, *not from records in HPD's RMS*." ECF 144, Ex. 3, ¶ 16. Moreover, as Defendants note, Plaintiff has failed to identify an applicable hearsay exception for Mr. Stewart's report. *See* ECF 144 at 9 n.5; *see also* Fed. R. Civ. P. 56(c)(2). Even apart from issues of admissibility, Mr. Stewart's report fails to contradict Defendants' statement of fact concerning EIS quarterly reporting notifications. And for these same reasons, Plaintiff lacks support for SAMF G, in which she asserts that the HPD "did not have an Early Warning System between 2016 and 2017." *Compare* ECF 138 at 14 ¶ G, *with* ECF 144, Ex. 3 ¶ 16.

[5] Plaintiff attempts to dispute this statement of fact by citing portions of Ms. Mohr's Declaration in which she opines that these incidents should have prompted an inquiry into the root causes of triggering incidents and served as a warning that Officer Marinovich required additional training, even assuming that each use of force was justified independently. ECF 138 at 7–8, ¶ 13(i)–(vi). Ms. Mohr's opinions do not controvert Defendants' factual assertions that each of Officer Marinovich's notification-triggering incidents were found to be within HPD policy and did not result in discipline.

reviewed by a supervisor not directly responsible for the officer(s) implicated, and none of the seven incidents was found to violate HPD policy or involve unconstitutional use of force. *Id*. at 10, ¶¶ 18, 19.

Chief Ortolano served as HPD Police Chief from September 3, 2019, until January of 2022. *Id*. at 11, ¶ 21. In that role, he had general oversight over HPD officers, including Officer Marinovich. *Id*. at 11, ¶ 22. Although he was aware when he began serving as Chief that a decades-old consent decree was in place to address complaints of profiling and/or selective policing against certain racial minorities by HPD, *id*. at 12, ¶ 31, he did not see any evidence that HPD had a culture that condoned the use of excessive force, *id*. at 12, ¶ 30.

## C.  Policy and Training

During Chief Ortolano's tenure, HPD had a "Crisis Intervention Policy" for dealing with individuals experiencing mental health crises. *Id*. at 11, ¶ 23. This policy defined a crisis as "any event where an [individual] or their family is in need of mental health, law enforcement, or community assistance," and his/her "level of stress or mental health symptoms . . . exceed[] the person's internal ability to manage his/her behavior or emotions and their ability to cope." *Id*. at 11, ¶ 24; *see also* ECF 133, Ex. G, at 1. Pursuant to that policy, HPD had available sworn personnel trained and certified in crisis intervention" ("CIT Officers") as well as Lea County Communications Authority "Tele-communicators[, who were] a good resource to ensure CIT officers [were] dispatched appropriately." ECF 133 at 11 ¶ 25; *see also* ECF 133, Ex. G, at 1. HPD's Crisis Intervention Policy provided that when a call for service was received by HPD that reasonably involved a citizen experiencing a mental health crisis, the following steps were to be followed by the responding officer: (1) promptly assess the situation and make a preliminary determination regarding whether a mental health crisis may be a factor; (2) request a CIT Officer

if one is not present or en route; (3) if possible, wait for a backup officer prior to making contact with the individual in crisis; and (4) if the officer determines the individual needs an evaluation and will not voluntarily seek assistance, make a protective custody decision in accordance with N.M. Stat. Ann. (1978) § 43-1-10. ECF 133 at 11–12, ¶ 26; *see also* ECF 133, Ex. G, at 1–2, § III(A). On the night in question, Officer Marinovich did not resort to the procedures called for in the Crisis Intervention Policy by calling for a CIT officer or waiting for backup before attempting to forcibly stop Albert. *Id*. at 12, ¶ 28.

In 2019, as part of his biennial training for continued certification as a peace officer, Officer Marinovich received training from the State of New Mexico related to interacting with persons with mental impairments. ECF 133 at 10, ¶ 20; *see also* ECF 133, Ex. 6, at 12:4–13. Beyond this biennial training, HPD did not independently provide its officers specific training on dealing with persons with mental health issues other than "rol[l]-call training . . . where sergeants are given training topics to go over with their squads prior to going out."[6] ECF 133 at 12 ¶ 29. Prior to January 20, 2021, Officer Marinovich received training on how to take a suspect to the ground when that suspect was resisting apprehension. *Id*. at 12 ¶ 32. If the suspect sought to be detained was on a bicycle, Officer Marinovich was trained to grab and hold onto them. *Id*. He was not

---

[6] In her SAMFs, Plaintiff represents that Chief Ortolano "stated in his deposition that he recognized a need for a program to address mental health issues in [Hobbs], and had requested funding for a crisis response team. However, when funding was not approved, the program was not launched." ECF 138 at 15 ¶ K (citing "Ortolano 14:2–15:23"). Plaintiff does not, however, provide the referenced portion of Chief Ortolano's deposition testimony. Nor has the Court located that portion of Ortalano's deposition testimony elsewhere in the record. Although Defendants concede that Chief Ortolano "recognized there was a need to obtain more resources for dealing with mental health issues in Hobbs at a community level but was not able to secure funding for this project," ECF 144 at 18, they insist this fact is immaterial to the Court's summary judgment analysis. In other words, the fact that Chief Ortolano recognized the need for additional training related to mental health is technically undisputed but also unsupported by admissible evidence and, in Defendants' view, immaterial. As the Court sees it, Chief Ortolano's deposition testimony to this effect is only material if the lack of funding and training about which he testified contributed to the amount of force that Officer Marinovich used in his January 20, 2021 encounter with Albert. But as discussed more fully below, Plaintiff fails to come forward with competent and admissible evidence creating a genuine issue of material fact on this issue.

trained to push a subject off a bicycle as a means of bringing them into compliance or gaining control over them to make an arrest. *Id*. at 13 ¶ 36.

### D.  Previous Pursuit of Albert on Bicycle

HPD had previously apprehended Albert on his bicycle. On July 21, 2020, Officer Still engaged in a foot pursuit and took Albert down from behind as Albert attempted to mount his bicycle and flee arrest. *Id*. at 13 ¶ 33; ECF 138 at 12 ¶ 32(i)); *see also* ECF 133, Ex. H, at 1 (Original Narrative indicating "Officer Still then stated Albert attempted to get on his bike and flee. At this time, Officer Still stated that he tackled Albert off of the bike and detained him in handcuffs."); (Supplemental Narrative indicating "Albert ran to his bicycle and tried to pedal off. I told [him] to stop at this time. I then ran after Albert . . . ."). Officer Still proceeded to handcuff Albert while he was on the pavement. ECF 133 at 13 ¶ 34; *see also* ECF 133, Ex. H, at 1. Officer Still's July 21, 2020 take-down did not generate a complaint by Albert or his guardians for excessive force. ECF 133 at 13 ¶ 35.

## III. SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The entry of summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No triable issues remain if the nonmoving party fails to provide sufficient evidence to sustain any element essential to its case. *Id*. at 249.

For purposes of this inquiry, a court must provisionally resolve all genuine and material factual disputes in the nonmovant's favor. *See, e.g.*, *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curium). If the summary judgment movant invokes qualified immunity, courts typically "adopt[] . . . the [nonmovant's] version of the facts." *Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020); *accord Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). But when the record "contains video evidence of the incident in question," the Court will "accept the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' the [nonmovant's] version of events." *Armstrong*, 973 F.3d at 1131 (internal quotation omitted). Under our Local Rules, "[a]ll material facts set forth in the [motions and responses] will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).

If the summary judgment movant invokes qualified immunity, the burden, ordinarily the movant's initial responsibility, shifts to the non-movant to first establish (1) that a constitutional right was violated and (2) that said right was "clearly established" at the time of the defendant's unlawful conduct. *See e.g.*, *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden" of disproving the need for a jury's consideration by showing no dispute of material fact. *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).

## IV. PARTIES' PRIMARY ARGUMENTS

Defendants contend that Chief Ortolano is entitled to qualified immunity for Plaintiff's supervisory liability claim, because Plaintiff has failed to demonstrate that a training or supervision deficiency on Chief Ortolano's part set the stage for Officer Marinovich's allegedly unconstitutional use of force. ECF 133 at 13–16. Defendants emphasize that HPD had in place a policy outlining procedures for officers who were responding to incidents involving mental health

crises, but they insist that Plaintiff has not come forward with evidence to suggest that the policy was implicated when Officer Marinovich encountered Albert on January 20, 2021. *Id*. at 14–15. In addition, Defendants argue that Plaintiff has failed to show that Chief Ortolano was deliberately indifferent to a known and obvious risk. *Id*. at 15. In this regard, they observe that HPD used the EIS to help supervisors identify tendencies by officers, including as to use of force, and that review of EIS reports did not indicate that Officer Marinovich or other HPD officers required additional training or supervision on interacting with mentally-impaired individuals. *Id*. Even if Plaintiff could establish a constitutional violation by Chief Ortolano, Defendants insist that there is no clearly established law that would have put him on notice of the need to provide different or more comprehensive training or supervision. *Id*. at 16.

Plaintiff insists that there were deficiencies in HPD's training related to interacting with individuals with mental health issues. ECF 138 at 20–22. Indeed, she suggests that Chief Ortolano recognized as much. *Id*. at 20. Moreover, Plaintiff contends that there are material issues of disputed fact regarding Chief Ortolano's deliberate indifference to a known and obvious risk that preclude summary judgment. *Id*. at 21. Among the disputed facts she identifies are an ineffective record management system and conduct by Officer Marinovich being "flagged" by the EIS but not addressed through corrective action. *Id*. In addition, Plaintiff points to evidence that, in her view, shows that Chief Ortolano knew Officer Marinovich had engaged in reckless behavior toward the public and evidence that Officer Marinovich's "use of force cases" were frequently dismissed including in cases involving cognitively impaired individuals. *Id*. at 22. As to the second prong of the qualified immunity analysis, Plaintiff asserts that there is clearly established law in the Tenth Circuit regarding the need to train officers in dealing with those with mental illness. *Id*. at 21–22.

Turning to Plaintiff's municipal liability claims against the City, Defendants insist that Plaintiff has not set forth facts that would show the City had actual or constructive notice that Officer Marinovich or HPD as a whole required more training or supervision related to use of force on cognitively impaired individuals. ECF 133 at 16–17. In Defendants' view, the absence of any evidence to support the notice element of Plaintiff's municipal liability claim entitles the City to summary judgment on Count III.

Plaintiff counters with largely conclusory arguments. She asserts that the City failed to adequately train HPD officers on how to approach and interact with mentally ill individuals and on how to deescalate situations involving mental health crises. ECF 138 at 22–23. According to Plaintiff, the City was on notice that its officers would be required to interact with individuals with mental illness and that failing to train or supervise them in dealing with such individuals would result in a constitutional violation. *Id*. (citing ¶¶ A, M, F–O & Ex. 2).

## V.   ANALYSIS

Although there is notable overlap in the Court's analysis of Plaintiff's supervisory liability claims against Chief Ortolano and her municipal liability claims against the City, the Court discusses them separately, not least because the claims implicate different defenses and burdens. As an individual officer of the City, Chief Ortolano is immune from suit under § 1983 unless his actions 'violated a statutory or constitutional right that was clearly established at the time of he challenged conduct.'" *City & Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 611 (2015) (citation omitted). Because Chief Ortolano has invoked the qualified immunity defense, Plaintiff bears the initial burden on her supervisory liability claim to demonstrate a clearly established constitutional violation. *See id*. But the City, as a local government, is not eligible for the qualified immunity defense. *See Owen v. City of Independence, Mo*., 445 U.S. 622, 638 (1980).

Consequently, the City bears the burden to demonstrate that it is entitled to judgment as a matter of law on Plaintiff's municipal liability claim.

### A.  Supervisory Liability Claims against Chief Ortolano

Plaintiff contends that Chief Ortolano is liable in his supervisory capacity for the use of excessive force by Officer Marinovich.[7] ECF 1 ¶¶ 42–43; ECF 138 at 20–22. Notably, "there is no concept of strict supervisor liability under section 1983. In other words, it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (internal quotation marks and citation omitted). As she must with any individual defendant, the plaintiff must establish "a deliberate, intentional act by the supervisor to violate constitutional rights." *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992) (citations omitted). Moreover, she must show that there is an "affirmative link" between the supervisor's duties and the allegedly unconstitutional conduct. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). To do so, she must satisfy three elements: (1) personal involvement; (2) causation; and (3) state of mind. *Id.* (citation omitted).

Plaintiff's supervisory liability claims against Chief Ortolano come in two categories. First, she argues that Chief Ortolano failed to provide sufficient training to Officer Marinovich and other HPD Officers for dealing with individuals with mental health issues. ECF 138 at 20–21. Second, she suggests that Chief Ortolano failed to properly supervise Officer Marinovich. *Id.* at 22. With respect to each theory, Plaintiff must come forward with evidence to show that Chief Ortolano: (1) had some personal involvement, such as a responsibility for providing training or creating or

---

[7] The Complaint asserts supervisory liability for the "excessive force" used by both Officers Marinovich and Still. *See* ECF 1 ¶ 43. As discussed above, however, the Court's finding that Plaintiff failed to establish a constitutional violation based upon Officer Still's conduct in handcuffing Albert forecloses both supervisory and municipal liability claims premised on that conduct.

implementing a policy; (2) engaged in an act or omission that set in motion a series of events that he knew or should have known would cause a constitutional violation; and (3) was deliberatively indifferent to a known and obvious risk of constitutional injury. *See Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014); *Schneider*, 717 F.3d at 768–71. Acknowledging that Chief Ortolano bore supervising responsibilities for Officer Marinovich and his fellow officers, Defendants focus their arguments on the second and third elements, causation and state of mind.

> **i. Chief Ortolano did not engage in an act or omission that set in motion a series of events that he knew or should have known would cause a constitutional violation.**

Defendants insist that Plaintiff cannot "identify a particular act or omission on the part of the Chief that set the stage for Officer Marinovich to utilize the alleged tackle maneuver to seize Albert" from his bicycle. ECF 133 at 15. Although HPD did not formally train its officers on interacting with individuals with mental illnesses, Defendants note that Officer Marinovich's biennial training from the State covered this topic. *Id.* at 10 ¶ 20; ECF 138 at 10 ¶¶ 19–20.  In addition, Defendants emphasize that HPD had in place at the time of the subject incident a Crisis Intervention Policy, which outlined procedures for HPD officers to follow when responding to situations involving individuals experiencing mental health crises. ECF 133 at 11–12 ¶¶ 23–26. Under that policy, an HPD officer who determined that a mental health crisis might be a factor in a given situation was directed to request a specially-trained CIT Officer and, if possible, wait for a backup officer before making contact with the individual in crisis. *Id.* at 11–12 ¶ 26.

It is undisputed that Officer Marinovich did not resort to the steps outlined in the Crisis Intervention Policy by requesting the assistance of CIT officer(s) before he pursued Albert on foot. The parties disagree over whether he should have. Defendants take the position that there are no facts to suggest that the Crisis Intervention Policy should have been triggered because there are no

facts to indicate that Officer Marinovich should have been aware that he was confronting an individual experiencing a mental health crisis when he pursued Albert on that night. ECF 133 at 15. Plaintiff insists otherwise, arguing that Albert's "cognitive issues were well known to [Officer] Marinovich and the entire [HPD] as a result of multiple run-ins and criminal charges that were dismissed because of [Albert's] incompetence." ECF 138 at 11 ¶ 26(iii)). Yet, even assuming Officer Marinovich recognized Albert, the undisputed evidence is that Officer Marinovich was not aware that Albert had any mental health diagnoses or had been declared incompetent [ECF 133 at 7 ¶ 3], though he knew Albert had called dispatch and said awful and threatening things [ECF 138 at 11 ¶ 26(iii)].

Still, Plaintiff argues that "[a] solitary elderly individual pedaling his bicycle on the side of the darkened main thoroughfare, making obscene gestures, and yelling obscenities, would alert an objectively reasonable officer to the altered mental status of such an individual." *Id*. at 20. In Defendants' view, "[i]t is not apparent from the dash camera video . . . that Albert had mental health issues or was experiencing a mental health crisis." ECF 133 at 12 ¶ 27. Ultimately, the Court need not resolve this dispute because, even assuming it was apparent from Albert's behavior – in the few seconds it was observable – that his mental health condition may have been out of the ordinary, Plaintiff has not put forward any evidence to establish that a specific training or supervision deficiency *by Chief Ortolano*, including as it relates to the Crisis Intervention Policy, was the moving force behind Officer Marinovich's alleged use of excessive force against Albert. The Supreme Court's reasoning in *City of Canton, Ohio v. Harris* is helpful in this regard:

> [It] will not it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make

> mistakes; the fact that they do says little about the training program or the legal
> basis for [liability].

489 U.S. 378, 391 (1989).

In an attempt to identify a relevant training deficiency, Plaintiff represents that Chief Ortolano "recognized a need for a program to address mental health issues in [Hobbs] and . . . requested funding for a crisis response team[, but] funding was not approved[ and] the program was not launched." ECF 138 at 15, ¶ K (citing "Ortolano 14:2–15:23"). But notably, Plaintiff has not supplied for the Court's consideration the referenced portion of Chief Ortolano's deposition transcript. *See* ECF 138, Ex. 7 (providing only page 28 of Ortolano's Deposition testimony). Nor has the Court located the referenced deposition testimony elsewhere in the record. *See, e.g.,* ECF 133, Ex. F, at 1–5 (Defendants' exhibit with excerpts of Chief Ortolano's deposition transcript, which does not include 14:2–15:23). Thus, the testimony on which Plaintiff relies is not evidence before the Court.

Even if Plaintiff had presented evidence that Chief Ortolano recognized a generalized need for mental health resources and training, that recognition would only be material if some training deficiency at HPD set in motion Officer Marinovich's use of force against Albert on January 20, 2021. Plaintiff has not offered any competent evidence that this was the case. At most, she offers the conclusory causation opinion of her police procedures expert, Ms. Mohr:

> [T]he lack of training of Hobbs Police Officers as to individuals with mental health
> issues was a contributing factor in the amount of force used. Former Chief Ortolano
> described in his deposition that he recognized the need for mental health programs,
> training, and additional resources to deal with individuals with mental health issues
> in Hobbs, New Mexico, but he did not receive funding approval, so those needs
> went unfulfilled.

ECF 138, Ex. 1, ¶ 32. For purposes of summary judgment, however, this opinion is insufficient to raise a genuine issue of material fact. *See Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) ("the testimony of an expert can be rejected on summary judgment if it is

conclusory and thus fails to raise a genuine issue of material fact"). That is, the Court cannot discern from Ms. Mohr's opinion a logical nexus between a specific training deficiency and Officer Marinovich's use of force against Albert. The lack of foundation for Ms. Mohr's opinion is underscored by her deposition testimony.

At the outset, Ms. Mohr testified that "additional training would have made a difference" with respect to the force Officer Marinovich used against Albert. *See* ECF 144, Ex. 1, at 98:17–25. After defense counsel inquired further, Ms. Mohr went on to explain that, in her view, mental health training may have "possibly" or "likely" given Officer Marinovich "a different perspective that might have made him not be upset about being flipped off and [not] chase[] the guy down and grab[] him." *See id*. at 109:15–110:9. But this speculation about Officer Marinovich's reaction to an obscene gesture can hardly serve as a sound basis to support an opinion that HPD's deficient training contributed to Officer Marinovich's allegedly excessive use of force against Albert. Because opinions are only as good as the evidence or assumptions upon which they are based, Ms. Mohr's opinion falls outside Federal Rule of Evidence 702 and outside the acceptable boundaries of sufficiency to create a genuine factual issue as to causation. Without Ms. Mohr's causation opinion, Plaintiff is left with only her argument that "during Former Chief Oralano's [sic] tenure [HPD] was woefully deficient in providing . . . training regarding . . . . individuals" with mental illness." ECF 138 at 20–21. But this unsupported argument of counsel fails to establish a constitutional violation.

Plaintiff's inadequate supervision theory fares no better. In that regard, Plaintiff argues that the need for "additional . . . supervision in order to reinforce proper training in police techniques was readily apparent because Mr. Marinovich tackled [Albert] in violation of training and policies." ECF 138 at 21 (citing ¶ 2(iv)–(v)). Not only is Plaintiff's reasoning circular, she fails to

identify the supervisory act or omission by Chief Ortolano that set in motion Officer Marinovich's alleged excessive use of force. As with her failure to train theory, Plaintiff's failure to supervise theory falls short of meeting her qualified immunity burden on the element of causation.

In sum, Plaintiff's evidence does not raise a genuine factual issue as to whether Chief Ortolano, by allegedly failing to train or supervise Officer Marinovich, set in motion a series of events that the Chief knew or should have known would cause a constitutional violation. Accordingly, Plaintiff has failed to establish the causation element of her claims against Chief Ortolano sufficient to defeat summary judgment.

### ii. Chief Ortolano did not act with deliberate indifference as to a known and obvious risk of constitutional injury.

To establish deliberate indifference, mere negligence or even "heightened negligence" will not suffice. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997). Rather, Plaintiff must satisfy the "strict" deliberate indifference standard by showing that "an act or omission purposefully committed by a person who must have realized that the conduct was unnecessarily dangerous or which conduct was done heedlessly or recklessly, without regard to the consequences, or without regard to the rights and safety of others." *Zuchel v. City and Cnty. of Denver, Colo.*, 997 F.2d 730, 735 (10th Cir. 1993). Defendants insist that Plaintiff has failed to establish deliberate indifference on the part of Chief Ortolano. The Court agrees.

In an attempt to raise material issues of fact in dispute as to deliberate indifference, Plaintiff points to the following: (1) HPD's "long history of engaging in bias, abusive policing based on race and unlawful behavior by officers"; (2) the lack of a record management system between 2012 and 2016 that was "capable of capturing traffic and pedestrian stop and search data"; and (3) evidence that Officer Marinovich was "flagged" numerous times, but no corrective action was

taken.[8] ECF 138 at 21. None of these categories of evidence are sufficient to create a genuine issue of material fact as to deliberate indifference.

First, any history of bias and abusive policing based on *race* by the HPD is immaterial to Plaintiff's supervisory liability claims given her articulated theory of liability: that Chief Ortolano failed to provide adequate training and supervision as to interactions with individuals with *mental illness*. Second, the absence of a record management system capable of capturing traffic and pedestrian stop and search data is inconsequential in the face of undisputed evidence that HPD had a *separate* EIS system in place that helped supervisors identify the frequency of certain events, such as citizen complaints and use of force incidents, to alert them to the need to provide proactive training or supervision. Third, the evidence before the Court indicates that Officer Marinovich's supervisors reviewed the EIS reports that "flagged" his conduct but determined that each of his notification-triggering use of force incidents were within HPD policy. *See* ECF 133 at 10 ¶ 17. There is no reasonable inference that a lack of corrective action for *within-policy* use of force incidents is indicative of deliberate indifference to some substantial risk of constitutional harm. It is also noteworthy that, in the five years preceding the subject incident, HPD supervisors did not uncover use of force incidents by any HPD officers involving persons suffering from mental illness that violated HPD policy or involved the unconstitutional use of force.

In a last-ditch effort to survive summary judgment, Plaintiff refers the Court to two additional categories of evidence without providing any discussion as to how they support her supervisory liability claims: (1) reports and deposition testimony related to a 2019 incident in

---

[8] In addition, Plaintiff refers to Chief Ortolano's purported admission that there was a need for additional mental health related training and his failure to implement such training through less costly alternatives. ECF 138 at 21. As explained above, Chief Ortolano's testimony to this effect is not in the summary judgment record. Even if it was, a mere acknowledgement that HPD would benefit from additional training on the topic of mental illness, and a failure to implement such training due to unavailability of funding, fails to demonstrate deliberate indifference absent evidence that Chief Ortolano knew he was creating a situation that involved a substantial risk of constitutional harm. Critically, Plaintiff has failed to come forward with any evidence in that regard.

which, as she puts it, "Chief Ortalano [sic] knew that Mr. Marinovich engaged in life-threatening reckless behavior in dealing with the public" ECF 138 at 22 (citing ECF 138, Exs. 6–8); and (2) "public records establish[ing] that Mr. Marinovich's use of force cases were frequently dismissed by the prosecutor, including five times involving cognitively impaired individuals" *Id*. (citing ECF 138, Ex. 2). Plaintiff's Exhibits 6–8 appear to relate to a December 31, 2019 motor vehicle accident resulting from Officer Marinovich's high-speed pursuit through an intersection. *See* ECF 138, Exs. 6–8. Plaintiff's Exhibit 2 purports to be a "Summary of Known Dispositions of Brandon Marinovich's Arrests Set Forth in Sworn Declaration of Kristi Kelley," in which the author concludes that "17 percent were dismissed because of mental incompetency," as well as a collection of criminal case docket sheets pulled from various state court websites. *See* ECF 138, Ex. 2. Neither the source of the disposition summaries nor the compiler of the docket sheets is identified, and Plaintiff offers no foundational information for Exhibit 2. *See id*. And Plaintiff develops no argument as to how Officer Marinovich's 2019 accident or the referenced case dispositions establish deliberate indifference by Chief Ortolano. Moreover, none of these exhibits appear in her statement of additional material facts.[9] Without any context or corresponding factual assertions, these exhibits fall far short of creating a genuine issue of material fact as to deliberate indifference.

For their part, Defendants highlight HPD's use of the EIS and the absence of any indications from that system that either Officer Marinovich or his fellow officers required

---

[9] Plaintiff refers to these exhibits in the context of her unsuccessful attempts to dispute Defendants' proffered statements of material facts on unrelated matters. *See* ECF 138 at 9 ¶ 15(ii) (citing the 2019 accident in an attempt to dispute Defendants' statement of fact that Officer Marinovich's tort claim notices did not involve allegations of excessive force or battery during the course of an arrest), 6 ¶7(i) (citing the summary of case dispositions in an attempt to dispute Defendants' statement of fact that citizen complaints and use of force incident reports are entered into HPD's IA Pro Database). Because these exhibits did not "properly address" Defendants' statement of fact, the Court "considered [Defendants'] fact[s] undisputed for purposes of the motion." *See* Fed. R. Civ. P. 56(e)(2).

additional training on the topic of using force against individuals with mental illness. Although Defendants acknowledge a prior incident in which an HPD officer forcibly removed Albert from his bicycle, they observe that this earlier take-down did not generate a complaint by Albert or his guardians for excessive force. Absent such a complaint, the incident cannot be said to have put Chief Ortolano on actual or constructive notice of the need to train or supervise to prevent similar conduct in the future. In view of the undisputed material facts before the Court, Defendants insist that Plaintiffs have failed to establish that Chief Ortolano acted with deliberate indifference in failing to train or supervise Officer Marinovich or his fellow HPD officers. The Court agrees.

### iii.  Plaintiff has failed to identify clearly established law that would put Chief Ortolano on notice of a constitutional violation.

Turning to the second prong of the qualified immunity analysis, Defendants contend that Plaintiff has not identified some clearly established law that would have put Chief Ortolano on notice that his training and supervision of Officer Marinovich did not pass constitutional muster. The Court again agrees.

Plaintiff's only effort to identify clearly established law in satisfaction of her qualified immunity burden is her citation to a District of Colorado case: *Buben v. City of Lone Tree*, No. 08-CV-00127-WYD-MEH, 2010 WL 3894185 (D. Colo. Sept. 30, 2010). Not only is *Buben* not published Supreme Court or Tenth Circuit precedent, its facts do not offer the requisite notice to Chief Ortolano in any event. In contrast to HPD, the municipality in *Buben* did not have a written policy addressing interactions with mentally impaired individuals and its officers testified that they could not recall any training on that topic. *See* 2010 WL 3894185, at *6. Thus, *Buben* does not qualify as published case law clearly establishing that Chief Ortolano's supervisory conduct violated Albert's constitutional rights. As a result, Chief Ortolano is entitled to qualified immunity on both prongs of the analysis.

## VI.  Municipal Liability Claims against the City

Plaintiff seeks to hold the City liable for deliberate indifference to the need to train and supervise HPD on constitutional parameters for using force against individuals with mental illness. To establish municipal lability based upon a failure to train or supervise theory, "a plaintiff must 'identify a specific deficiency' that was obvious and 'closely related' to his injury, so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "The deliberate indifference standard may be satisfied when the municipality ha[d] actual or constructive notice that its action or failure to act [were] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." Sc*hneider*, 717 F.3d at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

Defendants insist that there are no facts to show that the City was on notice that Officer Marinovich required more training and supervision in using force on mentally impaired individuals. ECF 133 at 16. Likewise, they contend that there are no facts to show that the City was on notice of a more generalized problem at HPD with respect to using force against mentally impaired individuals. *Id*. Defendants highlight HPD's reliance on the EIS, which monitored officer conduct and provided indications when additional training or supervision was required. *Id.* at 15–17. Defendants emphasize that the EIS notification data did not indicate that Officer Marinovich or the department as a whole required any additional training or supervision related to the use of force against individuals with mental illness. *See id*. at 17; SUMF ¶¶ 5–10.

Plaintiff's arguments in response are largely conclusory in nature and unpersuasive. She asserts that "[t]he City was on notice that its failure to train and supervise its officers in dealing

with the mentally ill and cognitively impaired was substantially certain to result in a constitutional violation." ECF 138 at 23 (citing ECF 138 ¶¶ A, M, F–O). Yet, Plaintiff does not elaborate on how HPD's training was deficient or how the City was placed on notice that HPD officers required more or different training or supervision. Although she includes parenthetical citations to certain of her proffered additional statements of material fact, most of the referenced facts are entirely extraneous to Plaintiff's municipal liability claim, much less "closely related" to Officer Marinovich's alleged excessive use of force. *See, e.g.*, *id*. ¶ A (disproportionate rate of minority pedestrian stops); ¶ F (failure to train in bias-free policing); ¶ H (citation system's failure to capture race or ethnicity); ¶ M (training issues related to filing criminal charges to justify uses of force); ¶ P (training issues related to rendering aid and reporting injuries to health professionals). To the extent Plaintiff cites additional statements of fact that are relevant to Count III, they do not create genuine issues of material fact as to municipal liability for the same reasons they fail to do so with respect to Plaintiff's supervisory liability claim. *See supra* p. 18 (discussing Chief Ortolano's acknowledgment of the need for a program to address mental health issues and the lack of funding secured for that program); *see supra* pp. 18–19 (discussing Ms. Mohr's opinion that the lack of training as to individuals with mental health issues was a "contributing factor" in the amount of force Officer Marinovich used against Albert); *see supra* p. 22 (discussing the compilation of documents in Plaintiff's Exhibit 2 related to criminal case dispositions).

Applying the governing principles of law to the undisputed material facts, the Court is satisfied that the City is entitled to judgment as a matter of law. After all, Plaintiff has failed to point to any specific facts from which a jury could determine that the City was on notice that either Officer Marinovich or HPD as a whole required more or different training or supervision related to interactions with mentally impaired individuals, much less a training or supervision deficiency

that was so obvious that a violation of constitutional rights was likely to result. *See Schneider*, 717 F.3d at 773. Accordingly, the City is entitled to summary judgment on Plaintiff's municipal liability claim in Count III.

## VII.  CONCLUSION

For the foregoing reasons, the Court holds that both Chief Ortolano and the City are entitled to summary judgment with respect to Count III.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment [ECF 133] is **GRANTED**.  **IT IS FURTHER ORDERED** that Count III of Plaintiff's Complaint and this case are **DISMISSED WITH PREJUDICE**.

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***